REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  DURIE TANGRI LLP
   DARALYN J. DURIE (SBN 169825)
2  ddurie@durietangri.com
   SONALI D. MAITRA (SBN 254896)
3  smaitra@durietangri.com
   SARAH E. STAHNKE (SBN 264838)
4  sstahnke@durietangri.com
   217 Leidesdorff Street
5  San Francisco, CA  94111
   Telephone:    415-362-6666
6  Facsimile:    415-236-6300

7  Attorneys for Defendant
   ZYNGA INC.

8

9

10                  IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13  SEGAN LLC,                          Case No. 3:14-cv-01315-VC

14                  Plaintiff,          **DEFENDANT ZYNGA INC.'S NOTICE OF
                                        MOTION AND MOTION FOR ATTORNEYS'**
15       v.                             **FEES**

16  ZYNGA INC.,                         Date:    June 11, 2015
                                        Time:    10:00 a.m.
17                  Defendant.          Ctrm:    4, 17th Floor
                                        Judge:   Honorable Vince Chhabria
18

19

20

21

22

23

24

25

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on June 11, 2015 at 10:00 a.m. in Courtroom 4 of the above entitled court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Zynga Inc. by its attorneys moves, pursuant to 35 U.S.C. § 285 and 28 U.S.C. § 1927, for the Court to award attorneys' fees to Zynga.

This Motion is based upon this Notice of Motion and the Memorandum of Points and Authorities in support thereof, the declarations submitted herewith, the Complaint and other pleadings on file in this matter, the arguments of counsel, and all other material which may properly come before the Court at or before the hearing on this Motion.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION ...................................................................................................1

II.     PROCEDURAL BACKGROUND..........................................................................2

        A.      The Patent and the Accused Games.............................................................2

        B.      Segan's Untenable Claim Construction Positions and Inevitable Adverse Judgment.........4

        C.      Segan's Unreasonable Litigation Conduct Leading Up to Summary Judgment ................6

                1.      Segan failed to investigate the accused games. ......................................7

                2.      Segan improperly blocked inquiry into the factual bases for its expert's testimony...................................................................8

                3.      Segan failed to investigate its claims. ....................................................8

                4.      Segan did not provide a coherent theory of infringement.......................9

                5.      Segan engaged in unreasonable motions practice....................................9

III.    ARGUMENT ........................................................................................................10

        A.      Zynga is Entitled to Attorneys' Fees Under 35 U.S.C. § 285............................10

                1.      Fees are warranted because Segan's claim constructions were frivolous..............11

                2.      Fees are warranted because Segan failed to conduct an adequate pre-filing investigation........................................................12

                3.      Fees are warranted because of Segan's unreasonable litigation conduct. .............13

        B.      The Fees Zynga Expended in Defending This Case Were Reasonable............................13

        C.      Zynga is Entitled to Attorneys' Fees Under 28 U.S.C. § 1927.........................................14

IV.     CONCLUSION.....................................................................................................15

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### TABLE OF AUTHORITIES

PAGE(S)

<u>Cases</u>

*Bywaters v. United States*,
   670 F.3d 1221, *reh'g denied*, 684 F.3d 1295 (Fed. Cir. 2012) .......................................13, 14

*Classen Immunotherapies, Inc. v. Biogen Idec*,
   Civ. No. WDQ-04-2607, 2014 WL 2069653 (D. Md. May 14, 2014) .................................11

*Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*,
   No. 09-CV-5251 (JFB) (AKT), 2014 WL 1514235 (E.D.N.Y. Apr. 16, 2014) ..................14

*Harris v. Stonecrest Care Auto Ctr., LLC*,
   559 F. Supp. 2d 1088 (S.D. Cal. 2008) ................................................................................15

*In re Keegan Mgmt. Co., Sec. Litig.*,
   78 F.3d 431 (9th Cir. 1996) .................................................................................................15

*Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*,
   707 F.2d 425 (9th Cir.1983) ................................................................................................15

*Intellect Wireless, Inc. v. Sharp Corp.*,
   No. 10 C 6763, 2014 WL 2443871 (N.D. Ill. May 30, 2014) .............................................11

*Kilopass Tech. Inc. v. Sidense Corp.*,
   No. C 10–02066 SI, 2014 WL 3956703 (N.D. Cal. Aug. 12, 2014) ...................................11

*Lahiri v. Universal Music and Video Distrib. Corp.*,
   606 F.3d 1216 (9th Cir. 2010) ......................................................................................14, 15

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
   134 S. Ct. 2111 (2014)...........................................................................................................8

*Lugus IP, LLC v. Volvo Car Corp.*,
   No. 12-2906, 2015 WL 1399175 (D.N.J. Mar. 26, 2015) ...................................................11

*Lumen View Tech., LLC v. Findthebest.com, Inc.*,
   No. 13 CIV. 3599 DLC, 2014 WL 2440867 (S.D.N.Y. May 30, 2014)..............................11

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014)...........................................................................................10, 11, 13

*Oplus Technologies, Ltd. v. Vizio, Inc.*,
   No. 2014-1297, 2015 WL 1600056 (Fed. Cir. Apr. 10, 2015) ...........................................13

*Perdue v. Kenny A. ex rel. Winn*,
   559 U.S. 542 (2010)..............................................................................................................13

*Phonometrics, Inc. v. Westin Hotel Co.*,
   350 F.3d 1242 (Fed. Cir. 2003)............................................................................................15

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Prospect Capital Corp. v. Enmon*,
  No. 08 Civ. 3721 (LBS), 2010 WL 2594633 (S.D.N.Y. June 23, 2010), *aff'd in part
  and remanded*, 675 F.3d 138 (2d Cir. 2012)........................................................................14

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
  360 F.3d 1295 (Fed. Cir. 2004)...............................................................................12, 14

*Romag Fasterners, Inc. v. Fossil, Inc.*,
  No. 3:10CV1827 (JBA), 2014 WL 4073204 (D. Conn. Aug. 14, 2014)............................11

*Yufa v. TSI Inc.*,
  No. 09-CV-01315-KAW, 2014 WL 4071902 (N.D. Cal. Aug. 14, 2014) ........................11, 12, 13, 14

**Statutes**

28 U.S.C. § 1927........................................................................................................ i, 1, 14, 15

35 U.S.C. § 285.............................................................................................................. i, 1, 10

**Other Authorities**

C. Wright et al., *Federal Practice and Procedure*, § 2670 (3d ed. 2014) ...........................14, 15

**Rules**

Fed. R. Civ. P. 11 ...............................................................................................................1

Fed. R. Civ. P. 26(a)(2)........................................................................................................8

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

On April 7, 2015, the Court granted Zynga's motion for summary judgment.  Zynga requests that the Court find this case "exceptional" pursuant to 35 U.S.C. § 285 and award Zynga its attorneys' fees, expert witness fees, and costs.  Zynga also requests that Segan's counsel, Blank Rome LLP, be sanctioned and held jointly and severally liable for fees and costs, pursuant to 28 U.S.C. § 1927.[1]

Last year, the Supreme Court reframed the exceptional case standard for awarding attorneys' fees to the prevailing party in a patent case, expanding the scope of cases in which fee shifting is appropriate.  It held that "exceptional" has its ordinary meaning (such as "uncommon," "rare," or "not ordinary").  The Supreme Court identified two types of cases that meet this standard: "one that stands out from others with respect to [1] the substantive strength of a party's litigation position (considering both the governing law and the facts of the case)" *or* [2] "the unreasonable manner in which the case was litigated."  This case satisfies both independent bases for fees.

*First*, Segan's patent claim has never read on Zynga's system.  So, to manufacture infringement, Segan adopted tortured claim construction positions—at odds with the claim itself and in direct contrast with the terms' plain and ordinary meaning (Zynga's position).  The Court recognized Segan's constructions as meritless at the bond hearing on November 20, 2014, stating, "in contrast to 99.9-percent of other patent cases . . . there is a reasonable possibility that at the end of the day, this will be deemed an exceptional case for purposes of awarding attorney's fees."  Rather than end the case then and there (as Zynga repeatedly urged), Segan contrived an entirely new infringement theory at the eleventh hour—which required Segan to abandon the infringement theory it had pursued for over three years and rewrite most of its proposed constructions from scratch.  Segan's new theory and constructions only compounded the fatal flaws in Segan's case.  The Court agreed, describing Segan's new constructions as having "no support," "mak[ing] no sense," "contorting the claim language," and "render[ing] the claim nonsensical."  Dkt. No. 183 at 2, 4.  The ultimate result—a finding of non-infringement on summary judgment—was inevitable, because, as the Court noted, there is no infringement "under any logical

---

[1] Zynga separately moves for sanctions pursuant to Federal Rule of Civil Procedure 11, which Zynga files herewith.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

construction" of the claim terms.  *Id.* at 5.

*Second*, Segan litigated the case in an unreasonable manner for many reasons, including:

- Failing to conduct a reasonable pre-filing investigation by accusing (1) games that are not available in the United States, (2) a game called "Game" that does not exist at all (indicating a copy-paste from Zynga's website), (3) games without any evidence of how they operated, and (4) mobile applications that have no "browser application" as required by the claims;

- Refusing to drop the case after taking early depositions of Zynga's employees who testified without equivocation or challenge that Zynga could not infringe;

- Refusing to drop the case even after the Court stated that it was reasonably probable that it would find the case exceptional;

- Asserting method claims that were barred by Supreme Court precedent, only dropping them after Zynga spent considerable resources defending against them;

- Refusing to allow its expert to testify to the factual bases for his expert testimony;

- Providing inadequate infringement contentions that (1) cited source code from the wrong games, (2) did not provide any source code whatsoever for several claim limitations, and (3) did not include any evidence of Facebook's operations (even though Segan alleged that Facebook provided the primary components of the accused system); and

- Filing a baseless attorneys' fees motion and a frivolous motion to compel against Zynga.

Segan's case has been replete with missteps from the beginning.  As the Court aptly noted, "the more [Segan does] in this case, the more they twist themselves up into a pretzel."  As it stands now, while Segan lost on the merits, Zynga is out over a million dollars in fees and costs, and had to divert significant employee resources away from their core job duties to defend against a suit that was baseless from the start and litigated unreasonably.  This is exactly the type of case for which Congress empowers courts to shift fees.

## II.    PROCEDURAL BACKGROUND[2]

### A.    The Patent and the Accused Games.

Segan's asserted claims require:

- a target website for ***offering a new character enhancement*** for the user's character icon, wherein the new character enhancement is capable of being enabled in the user's record at the service provider ***without requiring user interaction with the service provider*** . . .

---

[2] Zynga's Rule 11 motion (filed herewith) provides additional detail regarding the background and procedural posture of the case.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

- wherein, when the user visits the target website using the browser program, the target website uses the unique identifier on the user device to access the user's record at the service provider ***without requiring user interaction with the service provider*** . . .

Dkt. No. 142-03 at19:3–7, 12–18 (Claim 1) (emphases added).  Segan alleged that Facebook is the target website and Zynga is the service provider.  With respect to these two elements, there has never been any debate about how Zynga's games work.  During game play, Zynga's servers communicate directly with the user device, as is readily apparent from public information.  As the Court explained:

> [W]hen [a user] plays an accused game in the Facebook iFrame—she engages with Zynga, or, more precisely, she never stops engaging with Zynga, which provides all the code and content for the game the user is playing. . . . [T]he parties agree that Zynga, not Facebook, provides the code and content for all the accused games that users play on the Facebook website.

Dkt. No. 183 at 5.  Thus, all items are "offered" by Zynga, not Facebook, and no aspect of gameplay occurs "without user interaction with the service provider" (Zynga).

This functionality is public; nevertheless, Zynga explained early on how its games worked.  In anticipation of Segan's infringement contentions required under this Court's local rules, Zynga wrote: "In your [Delaware] contentions, you identify Zynga's offering of what you contend are character enhancements — not anything offered by Facebook itself."  Dkt. No. 90-2 at A-5.  After Segan provided updated contentions which suffered from the same flaws, Zynga explained again:

> [W]e do not believe that you currently have (or have ever had) a good faith basis for alleging that Facebook is the target website and meets the limitations concerning a target website.  As you should know, Facebook provides a canvas for Zynga's games, and Facebook is nothing more than a picture frame—***so how can it be that Facebook provides enhancements or accesses the user record at the service provider***?  To be clear, ***users interact directly with Zynga servers*** when they play Zynga games.

*Id.* at A-8 (emphasis added).  After receiving yet another set of contentions, Zynga explained yet again:

> As we've explained already, Facebook provides a canvas for Zynga's games, and the Facebook website is nothing more than a picture frame—thus ***the user is "interact[ing] with the service provider" (Zynga) within that frame, not Facebook***.  This is explained in public literature . . . . Because Zynga is serving the game within the iFrame and communicating directly the game client, ***Facebook isn't providing any new character enhancements (Zynga is)***.

*Id.* at A-11 (emphasis added).  When Segan refused to relent, Zynga provided a declaration from one of its engineers, then made this engineer available for deposition.  Dkt. No. 94-04 at 5; Dkt. No. 90-2 at A-24–A-27.  Segan did not elicit a single contradictory fact during the deposition.  *See* Dkt. No. 85-04.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**B.      Segan's Untenable Claim Construction Positions and Inevitable Adverse Judgment**

Segan had no infringement read—and it has never had one.  This is made plain by their first round of claim construction positions:

| Zynga's Construction | Segan's Construction |
|---|---|
| *"access": gain entry to* | ***"the target website uses the unique identifier on the user device to <u>access</u> the user's record at the service provider"*** *means the target website communicates information associated with the user to the service provider so that subsequent activity (offering a new character enhancement) is consistent with information in the user's record and thus conducted in a way suited to that user's particular character icon (its present state and nature, history of previously enabled character enhancements, user preferences, and user profile).* |
| *"offering": plain and ordinary meaning* | ***"offering a new character enhancement for the user's character icon"*** *means making a new character enhancement known to a user and providing a way for the user to get it through some action taken by the user when visiting the target website* |
| *"without requiring user interaction with the service provider": plain and ordinary meaning* | ***"without requiring user interaction with the service provider"*** *means without the user having to take an action to leave the target website and visit a service provider site to take some action at that site.* |

Dkt. Nos. 85-08; 85-09.  Segan's constructions are at worst nonsensical and at best lacking any support.  Notably, Segan's construction for "without requiring user interaction with service provider" was a transparent effort to overcome the plain, uncontested fact that the user interacts with Zynga (the alleged service provider) throughout gameplay.  In evaluating these constructions, the Court did not mince words:

> [T]his is one of those exceedingly rare cases where the Plaintiff's proposed claim construction is so unreasonable on the surface -- to say that is even potentially to understate the point.  I mean, the unreasonableness of the Plaintiff's proposed claim construction leaps off the page . . . in contrast to 99.9-percent of other patent cases . . . there is a reasonable possibility that at the end of the day, this will be deemed an exceptional case for purposes of awarding attorney's fees.

Dkt. No. 122-04 (November 20, 2014 Hrg. Tr.) at 5:12–24.  Segan was undeterred.  It changed its infringement theory and proposed mostly new constructions, but notably, kept its proposed construction for "without requiring user interaction with the service provider" the same:

| Zynga's Construction | Segan's Construction |
|---|---|
| *"access": gain entry to* | ***access:*** *plain and ordinary meaning, to retrieve or obtain information from.* |
| *"offering": plain and ordinary meaning* | ***offering a new character enhancement for the user's character icon:***  *making a character enhancement known and available to a user.* |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

| Zynga's Construction | Segan's Construction |
|---|---|
| *without requiring user interaction with the service provider": plain and ordinary meaning* | ***without requiring user interaction with the service provider:*** *without the user having to take an action to leave the target website and visit a service provider site to take some action at that site.* |

Dkt. No. 108-01.  Segan's new infringement theory was that the target website was no longer just Facebook, but also the content provided to the user by Zynga.[3]  Segan still argued that direct communication between the user and Zynga did not count as "requiring user interaction with the service provider."

At the technology tutorial, however, Segan implicitly acknowledged that the patent did ***not*** cover Zynga's technology.  Segan created a slide, titled "Segan's Technology," showing how items could be "offered" under the patent if the character icon window were embedded in the target website:



*See* Declaration of Sarah E. Stahnke in Support of Zynga Inc.'s Motion for Attorneys' Fees ("SES Decl.") Ex. 1.  In Segan's slide, the item being "offered," the "soup bowl" icon on the left, is in the target website's browser window—not the character icon window showing content served from the service

---

[3] This was based on a new, expansive definition of "target website," which included not only information from Facebook, but also information from Zynga.  The Court did not construe this term.  Dkt. No. 183.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

provider.  Zynga's games work the opposite way:  all items are "offered" within the iFrame, in the part served by Zynga.  The implications are startling.  Segan knew (or most charitably should have known) that its patent only covered situations where the target website "offers" items to a user—but went ahead with a contradictory theory anyway.

Segan's new infringement theory fell flat.  The Court described the new constructions as "contorted," "extremely overbroad," and "results-driven."  SES Decl. Ex. 2 at 3:16; 3:19; 4:13.  The Court noted that without these constructions, Segan had no infringement read: "[I]t's undisputed that . . . when the user is playing the Zynga game on Facebook, the user is interacting with Zynga.  And I think that it's undisputed that Zynga is offering, within the normal meaning of that word, character enhancements to the user.  And so there is no infringement."  *Id.* at 4:5–10.

In granting summary judgment, the Court rejected Segan's constructions of "offering" and "without requiring user interaction with the service provider," in favor of their plain and ordinary meanings.  The Court also rejected  Segan's argument that Facebook itself did not need to do the offering, explaining that Segan's construction would render the claim "nonsensical."  Dkt. No. 183 at 4.  Segan's construction for "without requiring user interaction with the service provider" fared no better; the Court similarly explained that Segan's construction made "no sense."  *Id.* at 2.

Because there was no factual dispute concerning the workings of Zynga's system, Segan's claims had to be dismissed under a plain and ordinary meaning.  *Id.* at 5.  When a user "plays an accused game in the Facebook iFrame—she engages with Zynga, or more precisely, she never stops engaging with Zynga."  *Id.*  "So under the Court's construction—or, really, under any logical construction of 'interaction'—it is clear that a user . . . is engaging with Zynga, the service provider, from the moment the game is launched."  *Id.*

**C.      Segan's Unreasonable Litigation Conduct Leading Up to Summary Judgment**

Segan's conduct throughout this litigation evidenced a plaintiff who failed to: 1) responsibly investigate the products it accused, 2) investigate the claims it asserted, 3) provide a coherent theory of infringement, or 4) drop its case when it was apparent it could not prevail.  These failures, as well as frivolous motion practice, resulted in unreasonable and unnecessary litigation costs and expense.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1.      **Segan failed to investigate the accused games.**

Segan initially accused 45 separate games of infringement. *See* Dkt. No. 163-06 at Ex. A. Included were several games not accessible in the United States (and therefore could not infringe a U.S. patent) and a non-existent game called "Game" (indicating Segan just cut and pasted a list of Zynga games from a website).

With each subsequent set of infringement contentions, the list of accused games shifted. *See* Dkt. Nos. 163-07–163-09 (second set of contentions, 38 games accused; third set of contentions, 41 games accused, including six new game titles; fourth set of contentions, three new game titles accused). In June 2014, in its fourth set of infringement contentions, Segan accused mobile games for the first time. This was significant because the claims require a "browser," *see* '928 Patent Claim 1, yet Zynga's mobile games do not use a browser, as is apparent to anyone playing the game. Zynga raised this issue repeatedly, seeking to understand how its mobile games could possibly infringe. *See* Dkt. No. 90-02 at A-4, A-12, A-15, A-20. Segan provided no coherent response. Segan eventually limited the list of accused games to 11 (and dropped the last mobile game) one month before the close of discovery—but only after Zynga endured the considerable expense and burden of making source code available for all of the accused Zynga games, unnecessarily placed employees and document repositories under litigation hold, and collected and produced over 37,000 documents.

Segan also accused a number of discontinued games not publicly available. Segan provided no screenshots for these games, so it's reasonable to assume Segan never played these games before accusing them. *See, e.g.*, Dkt. No. 90-2 at A-14. After Zynga pressed the issue, Segan eventually provided a handful of publicly-available screenshots for the discontinued games—but it appears Segan simply found these screenshots through a Google search.[4] This suggests that nobody from Segan played these accused games ***at any point***. In fact, when asked whether he had played the accused games, Segan's expert was instructed not to answer: "Q. Can you recall which ones [of the accused games] you have played? MR. NYEMAH: Objection. To the extent that this calls for work product, things that that

---

[4] Compare SES Decl. Ex. 3 (June 20, 2014 Contentions Exhibit EE) with *id.* Ex. 4 (same screenshot, available at http://media.nbcbayarea.com/images/620*465/fishville_640x480.jpg); *see also id.* Ex. 5 (Excerpt from June 20, 2014 Contentions Exhibit GG) and *id.* Ex. 6 (same screenshot, from http://tech.mthai.com/wp-content/uploads/2011/12/Indiana-Iones-5.jpg).

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

[sic] we instructed you to do in order to work on this [sic] cases I instruct you not to answer." Dkt. No.

167-02 at 13:1–14:12; *see also id.* at 75:22–80:11.

### 2. Segan improperly blocked inquiry into the factual bases for its expert's testimony.

At the only deposition of Segan's expert, Segan's counsel instructed its expert not to answer

questions about *factual investigations he did* to support his expert testimony. *Id.* at 14:3–12; *see also id.*

at 112:5–8 ("To the extent that any of your answers would include work that you've done on behest of

Blank Rome attorneys I'll instruct you not to answer."). When asked what "skilled in the art" means in

his declaration, he was instructed not to answer. *Id.* at 38:25–39:19 ("[T]o the extent your answer would

include communications that you had with attorneys in developing your understanding, I'll instruct you

not to answer."). When asked whether he had any basis to believe that the source code was common

between games, he was instructed not to answer. *Id.* at 106:5–106:25 ("I will instruct you not to answer

or provide information regarding the process of your review or the techniques that you used in order to

perform that review . . . ."). When asked what the basis for his belief that all accused games use AMF

(an accused data format) was, he was instructed not to answer. *Id.* at 292:13–25. The list goes on (and

on). *Id.* at 98:7–16, 120:18–121:21, 104:3–104:8, 122:17–25. This is flagrantly improper, *see* Fed. R.

Civ. P. 26(a)(2), and precluded Zynga from testing the expert's assertions.

### 3. Segan failed to investigate its claims.

Segan persisted in asserting method claims against Zynga after the Supreme Court decided, on

June 2, 2014, *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111 (2014). *Akamai*

held that a single actor must perform each step of a method claim. *Id.* This meant Segan's method

claims could not be infringed, because the method claims indisputably require multiple actors: Zynga,

Facebook, and a user. Within days of *Akamai* being decided, Zynga reached out to Segan regarding

*Akamai* and asked if Segan was dropping the method claims. SES Decl. Ex. 7. Segan not only refused to

drop the method claims (without explanation), but reasserted them just days later in its June 20, 2014

infringement contentions. Zynga wrote again, requesting Segan's theory of infringement for the method

claims. Dkt. No. 90-02 at A-10–A-11. Segan finally dropped the method claims on July 25, 2014,

nearly two months after *Akamai* was decided and just days before Zynga's invalidity contentions were

8

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

due.  Zynga had prepared over 1,000 pages of charts for the method claims, an expense that was wholly unnecessary.

### 4.        Segan did not provide a coherent theory of infringement.

Segan's infringement contentions were wholly deficient.  As a prime example, the asserted claims require "the target website use[] the unique identifier on the user device to access the user's record at the service provider."  Yet Segan failed to cite any evidence from Facebook (the purported target website), of whether and how Facebook satisfied this element.  In fact, Segan failed to even *take* any evidence from Facebook.  It sought no documents from Facebook, propounded no written discovery to Facebook, and did not review any of Facebook's code.  As Segan's expert admitted, "I can't comment on specific processes that Facebook may or may not use . . . [b]ecause I haven't reviewed extensive portions of Facebook's code."  Dkt. No. 174-03 at 247:3–248:6.  Segan also refused discovery into the factual bases for its expert's opinions, including all questioning into the facts its expert uncovered during his source code review.  *See* Section II(C)(2), *supra* ("To the extent that any of your answers would include work that you've done on behest of Blank Rome attorneys I'll instruct you not to answer.").  This effectively precluded Zynga from testing Segan's theories of infringement.  Segan further failed to cite any source code at all for many elements, even though it had been ordered to provide "all the source code cites for each of the claim elements" that involved a software component.  Dkt. No. 163-18 at 23:18–24:8.  And most of Segan's source code citations were for the wrong game, a violation of the Patent Local Rules that the Court described as seemingly "an exceptional failing."  Dkt. No. 163-19 at 1:25–2:6.[5]

### 5.        Segan engaged in unreasonable motions practice.

Last fall, Zynga filed its bond motion based on concerns that Segan had an exceptionally weak case and an understanding that ██████████████.  In response, Segan filed a cross-motion for attorneys' fees, which was nothing more than a retaliatory motion.  In this motion, Segan complained about little more than Zynga's repeated explanations to Segan that it had no case and the filing of the bond motion itself.  The Court denied Segan's fees motion without comment.  Dkt. No. 113.

---

[5] These and other deficiencies in the infringement contentions are described in detail in Zynga's briefing on its Motion to Strike, Dkt. Nos. 163 and 174, which are incorporated herein by reference.  The Court denied this motion as moot and did not make any determination on the merits.  Dkt. No. 183.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Shortly after the close of discovery, Segan filed an omnibus motion to compel that covered nearly

2    every aspect of the case.  Dkt. No. 125.  Segan served this motion on Zynga at 5:00 p.m. on Christmas

3    Eve without advance warning and without attempting to meet and confer, as required by the local rules.

4    The motion attached a chart and a 373-page appendix detailing supposed discovery deficiencies and

5    demanded Zynga's portion of the joint letter by Monday, December 29, 2014 (notwithstanding that all

6    days between December 24 and December 29 were non-business days).  *See id.*  Judge Spero denied the

7    motion to compel in its entirety.  *See* Dkt. No. 135.  *First*, Judge Spero found that the motion violated the

8    local rules as untimely, holding that Segan had "no excuse" for its conduct, including serving on

9    Christmas Eve and demanding a response immediately.  *Id.  Second*, Judge Spero noted that "Segan

10   violated the orders of this Court by failing to meet and confer in person before filing the letter" and

11   condemned Segan for "tr[ying] to do an end run around . . . the meet and confer requirement."  *Id.* at 2.

12   *Finally*, "were the Court inclined to consider the merits of the Motion, it would be denied. . . . Plaintiff

13   has an obligation to demonstrate that the [discovery sought] is justified. . . . Plaintiff has not even tried to

14   do so."  *Id.* at 2–3.  Regardless of Segan's motivations (which are suspect, to say the least), this motion

15   was unreasonable and irresponsible.

16   **III.    ARGUMENT**

17       **A.    Zynga is Entitled to Attorneys' Fees Under 35 U.S.C. § 285.**

18       The fee-shifting provision applicable to patent cases, 35 U.S.C. § 285, states "[t]he court in

19   exceptional cases may award reasonable attorney fees to the prevailing party."  The Supreme Court

20   recently examined this provision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct.

21   1749, 1751 (2014).  Under *Octane Fitness*, an exceptional case warranting attorneys' fees is "simply one

22   that stands out from others with respect to the substantive strength of a party's litigating position

23   (considering both the governing law and the facts of the case) *or* the unreasonable manner in which the

24   case was litigated."  *Octane Fitness*, 134 S. Ct. at 1751 (emphasis added).  The Supreme Court instructed

25   the district courts to "determine whether a case is 'exceptional' in the case-by-case exercise of their

26   discretion, considering the totality of the circumstances."  *Id.*  In so holding, the Supreme Court rejected

27   Federal Circuit's test that a party had to show subjective bad faith and objective baselessness.  *Id.* at

28   1758.  Entitlement to fees under Section 285 need only be shown by a preponderance of the evidence (as

10

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  opposed to the prior clear and convincing evidence standard). *Id*. Since the Supreme Court's decision in

2  April 2014, courts across the country have awarded fees under this standard.[6]

3          **1.     Fees are warranted because Segan's claim constructions were frivolous.**

4        A case is "exceptional" and warrants a fee award when the plaintiff advances frivolous claim

5  construction positions. For example, in *Sidense*, Judge Illston found a case to be exceptional based in

6  part on the "objective baselessness" of the patentee's claim construction position that contradicted its

7  statements before the Board of Patent Appeals and Inferences. *Kilopass Tech. Inc. v. Sidense Corp.*,

8  No. C 10–02066 SI, 2014 WL 3956703, at *10 (N.D. Cal. Aug. 12, 2014). And just weeks ago, the

9  District of New Jersey awarded fees based on the patentee's improper reading of the claims that "had no

10  objectively reasonable basis." *Lugus IP, LLC*, 2015 WL 1399175, at *6, 10–14. The claims in *Lugus*

11  described a child's car seat that could be "automatically" retracted into an adult seat. *Id.* at *1. In the

12  accused product, retracting the child seat "required manual intervention." *Id.* at *3. The plaintiff argued

13  that the limitation of "automatic" retraction was met because the accused product "was designed to be

14  operational with one hand and with limited force." *Id.* at *4. The court found the case exceptional

15  because this position was not objectively reasonable. *Id.* at *5–6.

16        Segan's claim construction positions have been equally (if not more) frivolous. The Court

17  described Segan's initial constructions as "contorted," saying, "the unreasonableness of the Plaintiff's

18  proposed claim construction leaps off the page." Dkt. No. 122-04 at 5:17–18, 6:13. The Court warned

19  Segan point-blank that its initial constructions were so unreasonable as to make the case exceptional:

20  "this is one of those exceedingly rare cases . . . in contrast to 99.9-percent of other patent cases . . . there

21  is a reasonable possibility that at the end of the day, this will be deemed an exceptional case for purposes

22  of awarding attorney's fees." *Id.* at 5:12–24. Segan pivoted, attempting to craft new claim constructions

23  to avoid an adverse ruling, but its new claim constructions were just as flawed, if not more. Presented

24  _____

25  [6] *See, e.g.*, *Yufa v. TSI Inc.*, No. 09-CV-01315-KAW, 2014 WL 4071902 (N.D. Cal. Aug. 14, 2014); *Lugus IP, LLC v. Volvo Car Corp.*, No. 12-2906, 2015 WL 1399175 (D.N.J. Mar. 26, 2015); *Romag Fasteners, Inc. v. Fossil, Inc.*, No. 3:10CV1827 (JBA), 2014 WL 4073204 (D. Conn. Aug. 14, 2014);

26  *Intellect Wireless, Inc. v. Sharp Corp.*, No. 10 C 6763, 2014 WL 2443871 (N.D. Ill. May 30, 2014); *Classen Immunotherapies, Inc. v. Biogen Idec*, Civ. No. WDQ-04-2607, 2014 WL 2069653 (D. Md. May

27  14, 2014); *Lumen View Tech., LLC v. Findthebest.com, Inc.*, No. 13 CIV. 3599 DLC, 2014 WL 2440867 (S.D.N.Y. May 30, 2014).

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    with Segan's new constructions, the Court remarked, "the more they do in this case, the more they twist

2    themselves up into a pretzel."  SES Decl. Ex. 8 at 27:13-15; *see also id.* at 17:24–18:1 ("your new

3    definition of a target website sounds like your old definition of access to me.  I mean, it just sounds very

4    convoluted.").  And in its summary judgment ruling, the Court said that Segan's constructions are

5    "clearly incorrect," have "no support," and "make[] no sense."  Dkt. No. 183 at 2, 4.  Segan pushed

6    ahead with its case even though there was no infringement "under ***any*** logical construction" of the claim

7    terms.  *Id.* at 5 (emphasis added).  Indeed, Segan's infringement theory did not even align with its

8    description of the patented technology to the Court at the technology tutorial.  *See* SES Decl. Ex. 1,

9    Segan's Slide 28, discussed *supra*.

10
                     **2.       Fees are warranted because Segan failed to conduct an adequate pre-filing**
11                                **investigation.**

12           Before filing suit, Segan was required to "interpret the asserted patent claims and compare the

13    accused device with those claims before filing a claim alleging infringement."  *See Q-Pharma, Inc. v.*

14    *Andrew Jergens Co.*, 360 F.3d 1295, 1300-01 (Fed. Cir. 2004).  Segan failed to do so.  All evidence is

15    that Segan failed to even *play* many of the accused games (for example, (1) games that were not available

16    in the U.S.; (2) games that had been discontinued, for which Segan provided no screenshots for years,

17    and for which Segan eventually provided only screenshots it apparently uncovered through internet

18    searches; and (3) the nonexistent game "Game").[7]  Segan also impermissibly blocked inquiry into its

19    expert's factual investigation, instructing him not to answer whether he had played the accused games.

20    Dkt. No. 167-02 at 13:1–14:12, 75:22–80:11.

21           Segan's failure to conduct an adequate pre-filing investigation was objectively unreasonable and

22    forced Zynga to retain, collect, and produce documents for games that should have never been accused in

23    the first place.  Recently, this District awarded fees where the plaintiff filed suit "without purchasing or

24    testing any of [the] accused products to determine if they infringed" and pursued its claims "in light of

25    substantial and uncontroverted evidence indicating that the accused products did not infringe."  *Yufa*,

26    2014 WL 4071902, at *3.  This case is no different: an adequate investigation would have revealed that

27    _____
     [7] For additional details concerning Segan's failure to conduct an adequate pre-filing investigation, see
28    Zynga's concurrently filed Motion for Rule 11 Sanctions, which is herein incorporated by reference.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   there was no infringement.  And to eliminate all doubt, Zynga produced source code for inspection,

2   provided employee declarations, and offered deponents so Segan could learn about its technology.  All

3   the evidence confirmed what Segan should already have known—that Facebook does not "offer"

4   character enhancements and that no aspect of gameplay occurs "without requiring user interaction" with

5   Zynga.  Just as in *Yufa*, it was objectively unreasonable to pursue the case.

6   **3.      Fees are warranted because of Segan's unreasonable litigation conduct.**

7          Segan advanced a number of other frivolous positions: (1) asserting method claims barred by

8   Supreme Court precedent, and refusing to drop them until days before Zynga's invalidity contentions

9   were due; (2) providing inadequate infringement contentions, which cited source code from the wrong

10  game, cited no evidence for many of the claim elements, and cited no evidence from Facebook; (3) filing

11  frivolous motions, such as a retaliatory fees motion and a meritless (and procedurally improper) motion

12  to compel that appeared designed to inconvenience Zynga over the holidays; and (4) failing to compare

13  each of the accused games to the patent claims.  Whether motivated by gamesmanship or recklessness,

14  this conduct was certainly "unreasonable."  *Octane Fitness*, 134 S. Ct. at 1751.  A district court should

15  award fees where a plaintiff engages in "an egregious pattern of misconduct."  *See Oplus Technologies,*

16  *Ltd. v. Vizio, Inc.*, No. 2014-1297, 2015 WL 1600056, at *3 (Fed. Cir. Apr. 10, 2015) (finding failure to

17  award fees was abuse of discretion).  Misconduct that gives rise to a fee award includes "delay[ing] the

18  litigation by strategically amending [the] claims," "ignor[ing] well-settled law," filing

19  "unreasonable"motions to compel, and amending infringement contentions to force an opponent to

20  defend "against a constantly moving target."  *Id.* at *1, 3.  Awarding fees here would also compensate

21  Zynga for its losses unreasonably incurred and deter similar conduct in the future.  *See Octane Fitness*,

22  134 S. Ct at 1756 n.6.

23  **B.      The Fees Zynga Expended in Defending This Case Were Reasonable**

24         Zynga's request for fees is evaluated for reasonableness compared to the "lodestar," which is the

25  "guiding light of . . . fee-shifting jurisprudence."  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551

26  (2010).  The Court must determine whether the request of fees and costs is reasonable under the specific

27  circumstances of this case.  *Id.*  Factors the court may consider include the sophistication of the work, the

28  prevailing forum rates, and the actual fee agreement between the firm and client.  *See Bywaters v. United*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   *States*, 670 F.3d 1221, 1232, *reh'g denied*, 684 F.3d 1295 (Fed. Cir. 2012).  Federal Circuit law controls

2   the calculation of reasonable attorney fees in a patent infringement case.  *Q-Pharma, Inc.*, 360 F.3d at

3   1299.  The goal of lodestar is to determine "the rate a paying client would be willing to pay."  *Claudio v.*

4   *Mattituck-Cutchogue Union Free Sch. Dist.*, No. 09-CV-5251 (JFB) (AKT), 2014 WL 1514235, at *13

5   (E.D.N.Y. Apr. 16, 2014) (citation omitted).  For this reason, "[n]umerous courts have recognized that

6   'negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the

7   market.'"  *Prospect Capital Corp. v. Enmon*, No. 08 Civ. 3721 (LBS), 2010 WL 2594633, at *4

8   (S.D.N.Y. June 23, 2010) (citation omitted), *aff'd in part and remanded*, 675 F.3d 138 (2d Cir. 2012).

9   Costs are also recoverable under Section 285.  *See Yufa*, 2014 WL 4071902, *supra*.

10         Through March 2015, Zynga's attorneys at Durie Tangri LLP have spent a total of 2,809.10 hours

11   on this case.  A detailed breakdown of hours expended is shown in the Supplemental Declaration of

12   Sarah E. Stahnke, which also describes the qualifications of the timekeepers and prevailing rates for

13   intellectual property attorneys in the area.  And Zynga, a sophisticated client, has endorsed Durie

14   Tangri's rates through its selection of counsel.  Zynga seeks fees and costs in the amount of

15   **$1,188,773.93**.  This includes fees and costs invoiced by Durie Tangri, fees invoiced by Zynga's counsel

16   in Delaware, fees invoiced by a separate firm that assisted in preparing claim charts, and fees Zynga paid

17   to an e-discovery vendor.  S*ee* Supplemental Stahnke Declaration; Dkt. Nos. 85-15–85-21.

18         **C.      Zynga is Entitled to Attorneys' Fees Under 28 U.S.C. § 1927**

19         Section 1927, "Counsel's liability for excess costs," provides:

20         Any attorney or other person admitted to conduct cases in any court of the United
            States or any Territory thereof who so multiplies the proceedings in any case
21         unreasonably and vexatiously may be required by the court to satisfy personally the
            excess costs, expenses, and attorneys' fees reasonably incurred because of such
22         conduct.

23   28 U.S.C. § 1927.  The purpose of this provision is "to place directly on attorneys a sanction that should

24   encourage them to refrain from the frivolous, to weigh considerations of relevancy and privilege

25   carefully when participating in discovery proceedings, and to advise their clients in accordance with their

26   best legal judgment rather than in terms of securing tactical advantage through the manipulation of the

27   process."  C. Wright et al., *Federal Practice and Procedure*, § 2670 (3d ed. 2014).  A finding of bad faith

28   is not required; recklessness is enough.  *Lahiri v. Universal Music and Video Distrib. Corp.*, 606 F.3d

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1216, 1219 (9th Cir. 2010); *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996).  An

action is frivolous when "the result is obvious or the arguments of error advanced are wholly without

merit."  *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 430 (9th

Cir.1983); *Harris v. Stonecrest Care Auto Ctr., LLC*, 559 F. Supp. 2d 1088, 1090 (S.D. Cal. 2008).

In *Lahiri*, the Ninth Circuit affirmed an award of all fees and costs incurred defending a frivolous

copyright claim where the attorney failed to make "even a cursory investigation" into the relevant facts

before filing a complaint, and maintained the suit for five years based on an "untenable interpretation" of

law.  *Lahiri*, 606 F.3d at 1221.  In *Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242 (Fed. Cir.

2003), the Federal Circuit affirmed the imposition of sanctions in a patent suit where the attorneys

refused to drop the case even after it became clear that their claim constructions could not succeed.

Here, Blank Rome failed to conduct an adequate pre-filing investigation; drafted not one, but two

sets of untenable claim constructions; and pursued its claims in the face of unchallenged evidence that its

claim constructions and infringement theory were doomed.  And its conduct in pursuing other frivolous

positions (asserting method claims; accusing games without an adequate investigation, failing to provide

adequate infringement contentions, and filing frivolous motions) unquestionably "multiplied the

proceedings," since Zynga was forced to defend itself against these claims.[8]  Zynga's fees and costs are

reasonable, as stated above.  Blank Rome is a large, international law firm that holds itself out as

experienced in patent litigation.  Levying fees is necessary to encourage counsel "to refrain from the

frivolous . . . and to advise their clients in accordance with their best legal judgment."  C. Wright et al.,

*Federal Practice and Procedure*, § 2670 (3d ed. 2014).  A fee award is particularly appropriate because

███████████████████████████████████.  This award would ensure Zynga is compensated for its losses.

## IV.    CONCLUSION

For the foregoing reasons, Zynga requests the Court 1) enter an order requiring Segan to pay

Zynga's fees and costs, in the amount of $1,188,773.93, and 2) enter an order finding Blank Rome jointly

and severally liable for fees and costs under 28 U.S.C. § 1927, in the amount of $1,074,448.84.

---

[8] Section 1927 sanctions are not appropriate for an initial pleading, but only for continuing a frivolous
case.  *See, e.g., In re Keegan*, 78 F.3d at 435.  Accordingly, Zynga is reducing the amount sought for
Section 1927 sanctions by $114,325.09, the fees billed by Zynga's Delaware counsel prior to transfer.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Dated:  April 21, 2015

DURIE TANGRI LLP


By: _____/s/ *Sonali D. Maitra*_____
          SONALI D. MAITRA

Attorneys for Defendant
ZYNGA INC.

DEFENDANT ZYNGA INC.'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES
CASE NO. 3:14-CV-01315-VC

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**CERTIFICATE OF SERVICE**

I certify that all counsel of record is being served on April 21, 2015 with a copy of this document via the Court's CM/ECF system.

*/s/ Sonali D. Maitra*
SONALI D. MAITRA

17