REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  DURIE TANGRI LLP
   DARALYN J. DURIE (SBN 169825)
2  ddurie@durietangri.com
   SONALI D. MAITRA (SBN 254896)
3  smaitra@durietangri.com
   SARAH E. STAHNKE (SBN 264838)
4  sstahnke@durietangri.com
   217 Leidesdorff Street
5  San Francisco, CA  94111
   Telephone:    415-362-6666
6  Facsimile:    415-236-6300

7  Attorneys for Defendant
   ZYNGA INC.

8

9

10               IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13  SEGAN LLC,                          Case No. 3:14-cv-01315-VC

14                      Plaintiff,      **DEFENDANT ZYNGA INC.'S NOTICE OF
                                        MOTION AND MOTION FOR SANCTIONS**
15       v.
                                        Date:    June 11, 2015
16  ZYNGA INC.,                         Time:    10:00 a.m.
                                        Ctrm:    4, 17th Floor
17                      Defendant.      Judge:   Honorable Vince Chhabria

18

19

20

21

22

23

24

25

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## **NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on June 11, 2015, at 10:00 a.m. in Courtroom 4 of the above entitled court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Zynga Inc. by its attorneys moves, pursuant to Federal Rule of Civil Procedure 11 for the Court to issue sanctions against Plaintiff Segan LLC.

This Motion is based upon this Notice of Motion and the Memorandum of Points and Authorities in support thereof, the declaration of Sarah E. Stahnke submitted herewith, the Complaint and other pleadings on file in this matter, the arguments of counsel, and all other material that may properly come before the Court at or before the hearing on this Motion.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

        A.      The '928 Patent ...........................................................................................2

        B.      Segan's Original and Amended Complaints. ..............................................3

        C.      Segan's Theories of Infringement. .............................................................4

        D.      Zynga Produces Evidence on the Operation of its Games. .........................6

        E.      Segan's Claim Construction Positions. .......................................................7

                1.      Segan's Construction of "Access." ..................................................7

                2.      Segan's Construction of "Without Requiring User Interaction With the
                        Service Provider." ............................................................................9

III.    ARGUMENT ..........................................................................................................9

        A.      Rule 11 Standards ........................................................................................9

        B.      Segan's infringement allegations are objectively baseless. .....................11

IV.     CONCLUSION.....................................................................................................15

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TABLE OF AUTHORITIES**

**PAGE(S)**

<u>**Cases**</u>

*Antonious v. Spalding & Evenflo Co.*,
  275 F3d. 1066 (Fed Cir. 2002)................................................................10, 11, 13, 14

*Battles v. City of Ft. Myers*,
  127 F.3d 1298 (11th Cir. 1997) ..............................................................................14

*ChemFree Corp. v. J. Walter, Inc.*,
  No. 1:04-CV-3711-JTC, 2008 WL 3884365 (N.D. Ga. 2008)...............................14

*Christian v. Mattel, Inc.*,
  286 F.3d 1118 (9th Cir. 2002) ................................................................................10

*Coburn Optical Indus., Inc. v. Cilco, Inc.*,
  610 F. Supp. 656 (D.C.N.C. 1985) .........................................................................14

*Digital Biometrics, Inc. v. Identix, Inc.*,
  149 F.3d 1335 (Fed. Cir. 1998)...............................................................................15

*Holgate v. Baldwin*,
  425 F.3d 671 (9th Cir. 2005) ..................................................................................10

*iLOR, LLC v. Google, Inc.*,
  631 F.3d 1372 (Fed. Cir. 2011)..........................................................................11, 14

*In re Keegan Mgmt. Co., Sec. Litig.*,
  78 F.3d 431 (9th Cir. 1996) ....................................................................................10

*MarcTec, LLC v. Johnson & Johnson*,
  664 F.3d 907 (Fed. Cir. 2012)................................................................................11

*Phonometrics, Inc. v. N. Telecom Inc.*,
  133 F.3d 1459 (Fed. Cir. 1998)...............................................................................15

*QPharma, Inc. v. Andrew Jergens Co.*,
  360 F.3d 1295 (Fed. Cir. 2004)..........................................................................11, 14

*Raylon, LLC v. Complus Data Innovations, Inc.*,
  700 F.3d 1361 (Fed. Cir. 2012)..........................................................................10, 11

*Truesdell v. S. Cal. Permanente Med. Group*,
  209 F.R.D. 169 (C.D. Cal. 2002).............................................................................14

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
  208 F.3d 981 (Fed. Cir. 2000)...........................................................................9, 10, 11

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997)..................................................................................................13

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**<u>Rules</u>**

Fed. R. Civ. P. 11 ................................................................................................................... *passim*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Within days of Zynga announcing its intention to go public in 2011, Segan, through its counsel at Blank Rome, filed this suit alleging that Zynga infringes a single patent, 7,054,928.  Segan's complaints violate Rule 11 because Segan did not have, and has never had, a credible infringement theory.  The patent describes a system where the user signs up with a "service provider," and deploys a "character icon" to browse the Internet, visiting "target websites" to receive enhancements to its character icon.  To accuse Zynga's games—which do not involve browsing the Internet and work nothing like the patented technology—Segan developed and applied claim construction positions that stretched well beyond reasonable.

For example, the claim requires that the target website (here, Facebook) access the user record at the service provider (here, Zynga) without the user having to interact with the service provider (again, Zynga).  Segan construed:

- "the target website uses the unique identifier on the user device to access the user's record at the service provider" to mean Zynga (the service provider) accessing its *own* user records; and

- "without requiring user interaction with the service provider" to exclude direct communications from the user to Zynga.  Segan's construction also required the Court to construe the term "service provider" two different ways in the same clause of the same claim, violating common sense and established Federal Circuit precedent.

No reasonable litigant could believe that it would prevail on these constructions—and without these contorted constructions, Zynga could not possibly infringe.  Throughout the case, Zynga has tried to explain to Segan it has no case.  It explained (in letter after letter, over the phone, and in person) the way Zynga's games worked, including voluntarily providing employee declarations and depositions, and why it could not possibly meet the claim limitations—and consistently asked for Segan's theory of the case.

After receiving no substantive response from Segan, in August 2014, before the most expensive phase of discovery began, Zynga offered a walk-away, where Zynga would agree not to seek fees in exchange for Segan dropping its case.  Segan refused, forcing Zynga to needlessly produce thousands of documents, tie up high-level employees for hours of depositions, file a motion for a bond, oppose (successfully) an omnibus discovery motion directed to nearly every aspect of discovery in the case, and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  proceed to costly summary judgment and claim construction briefing and argument.

2      The Court has already recognized the unreasonableness of Segan's position on "access"—and the

3  appropriateness of sanctions, at a hearing on Zynga's motion for a bond:

4      [M]y tentative view is that this is one of those exceedingly rare cases where the Plaintiff's
       proposed claim construction is so unreasonable on the surface—to say that is even potentially to
5      understate the point . . .  I think in contrast to 99.9-percent of other patent cases . . . there is a
       reasonable possibility that at the end of the day, this will be deemed an exceptional case for
6      purposes of awarding attorney's fees.

7  Decl. of Sarah E. Stahnke ISO Motion for Sanctions ("Stahnke Decl."), filed concurrently herewith, Ex.

8  1 (November 20, 2014 Hearing Tr.) at 5:12–24.  At that hearing, lead counsel for Segan addressed the

9  Court's statement that "access" should be given its plain and ordinary meaning and conceded that there

10 was no infringement—***twice***.  *Id.* at 66:22–24 ("[T]hat's a very strong concept of access.  And ***that's not***

11 ***what the target website does***." (emphasis added)); *id.* at 33:24–-34:1.  Despite these admonitions and

12 admissions, Segan pressed on—forcing Zynga to incur nearly a million dollars in unnecessary costs and

13 fees.

14     Between Zynga's efforts and the Court's assessment, Segan and its counsel are fully aware that

15 its case is deficient. ███████████████████████████████████

16 ███████████████████████████████████████████████████

17 ███████████████████████████████████████████████████

18 ███████████████████████████, the only way to deter Segan and its counsel from pursuing this

19 case—and others like them in the future—is to levy attorneys' fees sanctions against Segan's counsel at

20 Blank Rome.

21 **II.  BACKGROUND**

22     **A.    The '928 Patent**

23     The patent describes a system for "exploring web sites."  Stahnke Decl. Ex. 2 (U.S. Patent No.

24 7,054,928 ("'928 patent")) at 1:20–24.  An Internet user registers with a "service provider," whereupon

25 he or she provides "specific demographic data as well as preference and interest data, e.g., hobbies,

26 interests, etc."  *Id.* at 3:32–37.  At the service provider, "the user will be assigned or provided an

27 opportunity to select a character icon for use with the system."  *Id.* at 3:37–39. The user also downloads a

28 software program "for communicating with the [service] provider" and displaying the character icon.  *Id.*

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

at 3:54–62.  Then, the service provider lists a number of "target websites" for the user to visit in order to receive offers of enhancements to the character icon.  The purpose for this might be to "attract Internet users to advertiser websites by offering desired user incentives such as enhancements or upgrades to a character icon."  *Id.* at 2:7–10. When the user visits the target website, the target website accesses the user record at the service provider in order to offer the enhancement.  *Id.* at 7:48–55.  Claim 1 requires (in summary):

> 1.  a user device with (a) a browser, (b) a GUI application containing a proprietary communications protocol, and (c) a unique identifier;
> 2.  a service provider that (a) communicates with the GUI application using the proprietary communications protocol, and (b) maintains a user record including identification of the character icon, user preferences, and previously enabled character enhancements; and
> 3.  a target website that (a) offers new character enhancements (which are "appropriate for the user's character icon"), (b) accesses the user's record using the unique identifier, (c) all without user interaction with the service provider.*See id.* at Claim 1.

**B.    Segan's Original and Amended Complaints.**



On July 29, 2011, Segan filed a bare-bones complaint against Zynga in the District of Delaware, alleging infringement of the '928 patent.  Dkt. No. 1.  Zynga filed a motion to dismiss on the grounds that infringement had not been sufficiently pled.  Dkt. Nos. 11, 12.  In response, Segan filed an Amended Complaint on October 13, 2011, which provided an explanation, albeit a scant one, of the allegedly infringing instrumentalities—specifically alleging that Zynga infringed by acting in concert with Facebook.  Dkt. No. 14.  On March 19, 2014, the Delaware court transferred the case to this District. Dkt. No. 53.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### C. Segan's Theories of Infringement.

On January 31, 2014, Segan provided its first (brief) description of its infringement theory in response to an interrogatory. Stahnke Decl. Ex. 6. Segan's initial set of contentions significantly expanded its list of accused games—from 11 to 45—but did not include claim charts or screenshots for any of the accused games.[1] In its first set of contentions, Segan never alleged that Facebook (the purported "target website") accessed the user record, instead pointing to the GUI application on the user device accessing the user record. *Id.* at 14. Likewise, Segan conceded that the GUI application communicates directly with Zynga: "During play of an Accused Game, communications <u>between servers operated by Defendant and the GUI allow for information from the user's record to be visually represented in the GUI</u>." *Id.* at 12–13 (emphasis added). On February 21, 2014, Zynga wrote to Segan regarding Segan's failure to provide meaningful infringement contentions, noting numerous deficiencies in its contentions, including its allegations regarding the "user's record." *Id.* Ex. 7. In response, Segan served a second set of contentions that contained one "illustrative" claim chart that cobbled together screenshots from a handful of the 45 accused games. While it is difficult to decipher exactly what Segan is alleging, Segan comes close to alleging that Facebook accesses the user record:

> For example, a target website, e.g., Facebook, interacts with Zynga's software to gain access to the user record when a user launches one of the Accused Games on Facebook. Facebook then sends a request to Zynga that requests the game the user clicked. Information from that user's record is then returned from Zynga. For Zynga to be able to present the game to the user, it needs the user's Facebook UID, which is sent by Facebook to Zynga. Thus, the game is operable without the user directly visiting Zynga (see screenshot below).

*Id.* Ex. 8 at 18. But Segan never actually states that Facebook accesses the user record, nor does it provide any support for that theory.

After the case was transferred to this District, Zynga sent Segan a letter detailing the requirements of this District's patent local rules, explaining its concerns with the contentions provided so far (including the fact that Segan could not and has not alleged "access"), and stating that Segan was required to provide a separate claim chart for each game. *Id.* Ex. 9 (May 20, 2014 Ltr.). Segan's third set did have claim charts for each game, but had numerous other deficiencies, including failing to make

---

[1] It also included a non-existent game called "Game" and another game that is unable to be downloaded and played in the United States, "Zynga Plus Casino," indicating Segan just copied and pasted a list of Zynga games from a website without conducting any infringement analysis.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    any allegation that the target accesses the user record—again. *Id*. Ex. 10 at 21 (emphasis added)

2    ("Information from that user's record is then used by Zynga. The ***user*** never has to leave the target

3    website to access his or her own user record.") (emphasis added). The third set also re-defined "user

4    interaction" to mean "the user's perspective." *Id.* at 26. Zynga responded:

> [W]e do not believe that you currently have (or have ever had) a good faith basis for alleging that
> Facebook is the target website and meets the limitations concerning a target website. As you
> should know, Facebook provides a canvas for Zynga's games, and Facebook is nothing more
> than a picture frame—so how can it be that Facebook provides enhancements or accesses the
> user record at the service provider? To be clear, users interact directly with Zynga servers when
> they play Zynga games. Your infringement theory cannot possibly rest on your unsupported
> theory that "there is no direct interaction with Zynga <u>from the user's perspective</u>." What the user
> purportedly (and wrongly) perceives has nothing to do with how the games operate in reality,
> and basic public research and knowledge should have quickly dispelled your theory.

10    *Id.* Ex. 11 (June 10, 2014 Ltr.) at 2 (emphasis in original).

11        Zynga then agreed to allow Segan to file another, fourth set of contentions later that month, on

12    June 20, 2014. The fourth set of contentions, however, did not fix the problems and instead repeated

13    them, once again failing to allege that Facebook ***actually*** accesses the user record—instead alleging that

14    the target website accessed the record "in effect." *Id.* Ex. 12 at 25–26 ("The identifier is on the user

15    device, and the target website causes it to be sent to Zynga or third-party publisher, which uses it to

16    access the user's record, in effect allowing the target website, as a proxy for the user, to access the user's

17    record, without requiring the user to go directly to and interact with Zynga's or the third-party publisher's

18    website").[2] It once again repeated its "user experience" theory for "without requiring user interaction."

19    *Id.* at 21. Zynga again wrote to Segan asking for an explanation of access and explaining, in detail, how

20    the games worked and the fact that this information was available publicly. *Id*. Ex. 13 (July 9, 2014 Ltr.)

21    at 2–3. Zynga wrote yet again later that month, seeking to better understand Segan's reading of the term

22    access: "Access is widely defined as to obtain or retrieve information, which is consistent with the use of

23    the term throughout the asserted patent . . . . We don't understand how Segan can have a good faith basis

24    to allege that either the social networks or the offer wall providers 'access' the 'user's record' at Zynga.

25    Are you working under a different definition of 'access,' and if so, what is it?" *Id*. Ex. 14 (July 31, 2014

26    Ltr.) at 3. Segan did not provide any clarification.

---

[2] At one point, Segan accused a number of games published by third parties, hence the reference to third-party publishers and their websites. Those allegations have been dropped from the case.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### D.    Zynga Produces Evidence on the Operation of its Games.

Zynga produced in August 2014 complete source code for the accused Zynga games and a voluntary declaration from one of its engineers.  This declaration explained (with publicly information available to any game developer) precisely how Zynga's games operate on social platforms, like Facebook.  Stahnke Decl. Ex.15 (Aug. 15, 2014 Decl. of Kyle Saugier).[3]  Zynga also urged Segan to review the source code.  Finally, in late September—seven weeks after Zynga made the source code available, five weeks after Zynga provided non-infringement declarations, and less than three months before the close of discovery—Segan began its source code review.  Its initial review lasted only a day and a half on source code for 34 accused games.[4]  Segan returned for a second round of review in October.  This review lasted only three days.  In sum, before providing its final infringement contentions with source code citations on November 17, 2014 pursuant to an order by Judge Spero, Segan had only reviewed Zynga's source code for four and a half days.[5]

Zynga's August declaration established that when a user launches a game through a social networking site ("SNS") like Facebook, "the game content in the iFrame is transmitted from Zynga directly to the user.  It does not pass through the SNS's servers and the SNS does not manipulate the data Zynga provides into the iFrame." *Id*. ¶ 11.  The declaration also established that "[t]he SNS does not offer any of the virtual items within the game" and that "[i]nformation from the user record is loaded directly from Zynga's servers to the game running within the iFrame without passing through an SNS server." *Id*. ¶ 17.  It also stated "no third party, including Facebook or any other SNS, has access to Zynga's user records for the Zynga-owned accused games" and "Zynga does not provide information regarding game play specific information or user specific preferences for a particular user to any third party for the Zynga-owned accused games." *Id*. ¶¶ 15–16.  Segan sought to depose the declarant, and Zynga voluntarily provided the declarant for deposition.  The deponent confirmed the substance of his

---

[3] Zynga also provided a non-infringement declaration from an employee regarding the operation of "Offer Walls" in Zynga's games.  Segan eventually (and belatedly) dropped all of its allegations relating to Offer Walls.  Accordingly, Segan's Offer Wall allegations are not addressed in this motion.
[4] Because Segan's sweeping allegations accused dozens and dozens of games, Zynga was forced to make available for review over 300 gigabytes of source code.
[5] Segan also requested additional source code of prior versions of the accused games to be produced after November 17, 2014.  Zynga complied, but noted its irrelevance at that point.  Segan spent the last few days of the discovery period reviewing this code.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    declaration throughout his deposition.  *Id.* Ex. 16 (Saugier Sept. 25, 2014 Depo. Tr.) at 79:3–7, 85:23–

2    86:6, 112:21–113:2.

3         At the same time that Zynga provided the non-infringement declaration, Zynga offered a walk-

4    away to Segan: if Segan dropped its claims against Zynga, Zynga would not seek attorneys' fees at the

5    conclusion of the case.  Segan rejected Zynga's offer and pressed on.  Regarding access, it stated,

6    confusingly: "nowhere in the asserted claims is there a requirement for user record information to be

7    displayed in a game running within the iFrame without passing through a target website."  Zynga found

8    this statement unintelligible, and told Segan as much.  *Id.* Ex.17 (Sept. 3, 2014 Ltr.) at 4.  Segan provided

9    no further clarification.  Zynga tried again later that month:  "As we've explained several times, we do

10   not understand what you are accusing to meet the limitation[] . . . 'access' to the user record . . . ."  *Id.*

11   Ex. 18 (Sept. 12, 2014 Ltr.) at 3.  Again, Zynga received no reply.

12        **E.      Segan's Claim Construction Positions.**

13        Segan finally disclosed its claim construction positions on October 14, 2014, the court-ordered

14   date for the parties to exchange preliminary claim constructions—confirming that Segan's case hinged on

15   objectively unreasonable claim construction positions.

16        **1.      Segan's Construction of "Access."**

17        From the filing of this suit up until the bond motion hearing, Segan's lawsuit was premised on its

18   convoluted, unreasonable construction of "access":

19        ***the target website uses the unique identifier on the user device to <u>access</u> the user's record at the***
     ***service provider"*** *means the target website communicates information associated with the user to*
20   *the service provider so that subsequent activity (offering a new character enhancement) is*
     *consistent with information in the user's record and thus conducted in a way suited to that user's*
21   *particular character icon (its present state and nature, history of previously enabled character*
     *enhancements, user preferences, and user profile).*
22

23   Dkt. No. 85 at 8 (emphasis added).  Under this construction, the target website never needs to actually

24   access the user's record, consistent with all of Segan's prior contentions and allegations.  At the hearing

25   on Zynga's motion for a bond, the Court addressed Segan's "access" construction.  The Court did not

26   mince words, stating its preliminary finding was that the construction was unreasonable and there was a

27   reasonable possibility that the case would be found "exceptional" under Section 285:

28        [T]his is one of those exceedingly rare cases where the Plaintiff's proposed claim construction is

                                                  7

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

so unreasonable on the surface -- to say that is even potentially to understate the point.  I mean, the unreasonableness of the Plaintiff's proposed claim construction leaps off the page . . . I think in contrast to 99.9-percent of other patent cases . . . there is a reasonable possibility that at the end of the day, this will be deemed an exceptional case for purposes of awarding attorney's fees . . . . [T]he patent uses the word "access" many, many, many times.  And I do not believe there is a single time in which the patent uses the word "access" that would support the contorted construction that you have given it.

Stahnke Decl. Ex. 1 (Nov. 20, 2014 Hr'g Tr.) at 5:11–24.  The Court stated its preference for a plain and ordinary meaning of "access."  *Id.* at 37:11–16.  Segan made no argument in its briefing or at the hearing that it had an infringement read under a plain and ordinary meaning.  In fact, it conceded multiple times over the two and half hour hearing that it did **not** have an infringement read under a plain and ordinary meaning of the term:

THE COURT:  That begs the question **why you are not simply agreeing with me that "obtain" is an appropriate construction of the word "access."**  What are you trying to -- what are you trying to avoid by saying that "obtain" is an appropriate construction of the word 'access'?
MR. DOREY:  I'm troubled by the notion of an active -- confiscation is a bit strong, but an active exertion of dominion and control over the information for your own purposes.  That's the concept of – **that's a very strong concept of access. And that's not what the target website does.**

*Id.* at 66:14–24 (emphasis added).

THE COURT: And I say -- and I say, Judge Breyer, Ms. Maitra is coming by this afternoon, so I -- if you want to deliver a letter to her, you know, you might want to do it now so it's here when she gets here.  So he walks into my office, and he puts it in her mailbox.
MR. DOREY: Uh-huh.
THE COURT: And then she walks in the afternoon and she grabs it and she reads it.
MR. DOREY: Your example, **you don't have access to the information unless she says you can open the letter and read it to her or read it yourself**.

*Id.* at 33:16–34:1 (emphasis added).  Nevertheless, following the hearing, Segan pressed on with its case with an eleventh hour change to a construction under which it said it had no infringement read: "**[T]o access** . . . plain and ordinary meaning . . . to retrieve or obtain information from."  Dkt. No. 108-01 at A-17 (emphasis added).  It claimed this construction was consistent with both Zynga and the Court's construction.  Dkt. No. 117-1 at 1; Dkt. No. 117-3 at 1.[6]

---

[6] At the same time it changed its "access" construction, Segan also changed its construction of "target website" to "a website other than a service provider website for providing the recited functions; 'website' means a set of related web pages, each page identified by a URL and including its underlying code and all content presented by a browser when a user visits that page."  Dkt. No. 108-1 at A-11.  This convoluted double-construction of the term finds no basis in the specification, prosecution history, dictionaries, or case law.  This Court also stated its preliminary disapproval of the construction at a hearing on January 29, 2014, stating it had the same reaction to Segan's construction of "target website" as it did its prior construction of "access."  Stahnke Decl. Ex. 19 at 17:23–18:8.

8

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

### 2. Segan's Construction of "Without Requiring User Interaction With the Service Provider."

Segan has also based its case on the following: "'**without requiring user interaction with the service provider**' means without the user having to take an action to leave the target website and visit a service provider site to take some action at that site." Dkt. No. 85-09 at 8; *see also* Dkt. No. 108-1 at A-14.   Under Segan's construction, the direct communication that occurs between the user and the service provider *servers* (Zynga's servers) is not "user interaction with the service provider."   There is no support in the patent for altering "service provider" to "service provider site," as Segan has done.   In fact, the written description repeatedly refers to the "service provider" broadly (and including "service provider servers") and uses the term "service provider website" when intending to refer to an actual website.   *See*, *e.g.*, Stahnke Decl. Ex. 2 ('928 Patent) at Abstract, 2:45–50, 2:33–34, 4:1–3, 4:3–6, 4:8–15, 4:15–22, 4:23–25, 14:3–5.   Segan's construction would also require the Court to construe service provider in two different ways in the asserted claim (indeed, the same *clause*):   "wherein the new character enhancement is capable of being enabled in the user's record at the service provider [here, including the server] without requiring user interaction with the service provider [here, referring to the website exclusively]."

## III. ARGUMENT

### A. Rule 11 Standards

Pursuant to Federal Rule of Civil Procedure 11, an attorney presenting any "pleading, written motion, or other paper" to the Court certifies that he or she has performed "an inquiry reasonable under the circumstances" such that (1) "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;" (2) "the claims . . . are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;" and (3) "the factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"   Fed. R. Civ. P. 11(b)(1)–(3).[7]   "A patent suit can be an expensive proposition.   Defending against baseless claims of infringement subjects the alleged infringer to undue costs—precisely the scenario Rule 11 contemplates."   *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000).

---

[7] Pursuant to Rule 11, on March 9, 2015, Zynga served Segan with a copy of this motion.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Rule 11 requires the Court to ask whether the attorney's actions were objectively reasonable under the circumstances. *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 434 (9th Cir. 1996).  This standard requires counsel to conduct a reasonable investigation of the facts and a normally competent level of legal research to support the presentation. *Antonious v. Spalding & Evenflo Co.*, 275 F.3d 1066, 1074 (Fed. Cir. 2002).  Zynga is not required to show bad faith because Segan's subjective intent is not relevant to this inquiry.  *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1367–68 (Fed. Cir. 2012) (holding that an evaluation of Raylon's motives "has no place in the Rule 11 analysis" under the Fifth Circuit's similarly objective standard).  "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."  Fed. R. Civ. P. 11(c)(1); *see also View Eng'g*, 208 F.3d at 986–88 (imposing sanctions on law firm); *Antonious*, 275 F.3d 1066, *passim* (same).

When a "complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually 'baseless' from an objective perspective, and (2) if the attorney has conducted 'a reasonable and competent inquiry' before signing and filing it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (citation omitted); *see also Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005).  After a suit is filed, the notes to Rule 11 explain that the 1993 rule change "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable."  Fed. R. Civ. P. 11 advisory committee note to 1993 amendments; *see also Raylon*, 700 F.3d at 1367.

In the patent context, there are two distinct ways in which a plaintiff's initial filing can violate Rule 11.  A patent plaintiff may assert a frivolous proposed claim construction in violation of Rule 11(b)(2), or may fail to make an adequate factual investigation before filing the complaint, in violation of Rule 11(b)(3). *Antonious*, 275 F.3d at 1072.

Regarding the first, Rule 11 requires an attorney to interpret the pertinent claims of the patent before alleging infringement. *Id.*; *see also View Eng'g*, 208 F.3d at 986.  The attorney may not rely solely on the client's claim interpretation, but must perform an independent claim analysis. *Antonious*, 275 F.3d at 1072.  An objectively frivolous claim construction position subjects the attorney to sanctions. *Id.* at 1072–73.  There is a threshold below which a claim construction is "so unreasonable that no

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   reasonable litigant could believe it would succeed," *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1378

2   (Fed. Cir. 2011), and thus warrants Rule 11 sanctions. *See QPharma, Inc. v. Andrew Jergens Co.*, 360

3   F.3d 1295, 1301 (Fed. Cir. 2004); *cf. MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 918 (Fed. Cir.

4   2012) (finding a claim construction position objectively baseless where "no reasonable application of the

5   principles enunciated in *Phillips* . . . supports its position" (citation omitted)).  In fact, the Federal Circuit

6   has found that it can be an abuse of discretion for a district court not to impose Rule 11 sanctions when a

7   party has proffered an objectively unreasonable claim construction position. *Raylon*, 700 F.3d at 1368-

8   69, 1371.

9          As to the second, an attorney also violates Rule 11 by failing to compare the accused device with

10   the construed patent claims on an element-by-element basis before filing suit. *Antonious*, 275 F.3d at

11   1073–74; *View Eng'g*, 208 F.3d at 986.  "[A]n attorney violates Rule 11(b)(3) when an objectively

12   reasonable attorney would not believe, based on some actual evidence uncovered during the prefiling

13   investigation, that each claim limitation reads on the accused device either literally or under the doctrine

14   of equivalents." *Antonious*, 275 F.3d at 1074.  "In bringing a claim of infringement, the patent holder, if

15   challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it

16   believed before filing the claim that it had a reasonable chance of proving infringement.  Failure to do so

17   should ordinarily result in the district court expressing its broad discretion in favor of Rule 11 sanctions,

18   at least in the absence of a sound excuse or considerable mitigating circumstances." *View Eng'g*, 208

19   F.3d at 986.

20          **B.     Segan's infringement allegations are objectively baseless.**

21          Segan's counsel violated Rule 11 by bringing and continuing to pursue an infringement claim

22   against Zynga when a reasonable pre-filing investigation would have revealed that:  (1) Facebook did not

23   access Zynga's user record and therefore could not meet the claim limitation that "the target website uses

24   the unique identifier on the user device to access the user's record at the service provider"; and (2) Zynga

25   was in direct contact with users when they play Zynga's games and could not meet the claim limitation

26   that items are offered and user records are updated "without requiring user interaction with the service

27   provider."  Segan and its counsel had ample public information confirming these facts, including

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Facebook developer documents and industry experts.[8]  While it is unclear what, if any, pre-filing investigation Segan conducted,[9] it appears they knew of these deficiencies before filing suit and before receiving any non-public information from Zynga.  Yet, Segan still instituted this action against Zynga.  Indeed, Segan served four sets of infringement contentions prior to receiving non-public information from Zynga.  None of these contentions contained allegations that Facebook accessed Zynga's user record or that user records at Zynga were updated without user interaction with the service provider.  For example:

*The first set* of contentions alleged that "the GUI application on the website . . . access[es] the user record maintained by Defendant so the user does not have to visit Defendant's website to obtain such access, or leave Facebook in order to play."  Stahnke Decl. Ex. 6 at 14.

*The second set* of contentions alleged that "Facebook . . . sends a request to Zynga that requests the game the user clicked.  **Information from that user's record is then returned from Zynga**.  For Zynga to be able to present the game to the user, it needs the user's Facebook UID, which is sent by Facebook to Zynga.  Thus, the game is operable without the user directly visiting Zynga."  *Id*. Ex. 8 at 18 (emphasis added).

*The third set* of contentions alleged that "the SW code that enables use of the Accused Games . . . provides for a user interacting with the target website, such as Facebook, which uses unique identifying information from the user's computer to transmit user identifying information [to] Zynga  . . . **Information from that user's record is then used by Zynga**.  The user never has to leave the target website to access his or her own user record."  *Id*. Ex. 10 at 21 (emphasis added).

*The fourth set* of contentions alleged that "[t]he identifier is on the user device, and the target website causes it to be sent to **Zynga . . . which uses it to access the user's record**, in effect allowing the target website, as a proxy for the user, to access the user's record, without requiring the user to go directly to and interact with Zynga's or the third-party publisher's website."  *Id*. Ex. 12 at 25–26 (emphasis added).

---

[8] For instance, the non-infringement declarations that Zynga provided were not subject to any confidentiality restrictions.  They were based on well-known facts in the industry.

[9] Ample evidence Zynga will detail in its other motions for sanctions indicates Segan's pre-filing investigation fell well below a reasonable investigation.  *See also supra* notes 1–2.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

It was objectively baseless for Segan to file and pursue claims directed toward Facebook's purported role as the target website.  Segan had no evidence that Facebook met the target website limitations—as evidenced by its own infringement contentions.  Based on the publicly available evidence, "an objectively reasonable attorney would not believe . . . that each claim limitation reads on the accused device," and thus, the filing runs afoul of Fed. R. Civ. P. 11(b)(3).  *Antonious*, 275 F.3d at 1074.

Segan's invocation of the doctrine of equivalents cannot save its claim.  Segan's doctrine of equivalents arguments are unfounded because they would entirely vitiate the role of the target website in accessing the user record.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997).  Segan's equivalents theories write this limitation out of the claim altogether:  "Segan contends that a user at a website who accesses his or her user record at Zynga by, for example, sending or causing to send a request using a browser, would, under the doctrine of equivalents, be equivalent to the claimed 'target website uses the unique identifier on the user device to access the user's record . . . .'"  Stahnke Decl. Ex. 12 ( Fourth Set of Contentions) at 44.  That is, Segan contends that a user communicating directly with Zynga's servers through a browser, with no participation whatsoever by the target website, is equivalent to the target website accessing the user record.  This is improper under *Warner-Jenkinson*.

To overcome its deficient infringement contentions, Segan attempted to rewrite the asserted claims through its proposed claim constructions, which significantly depart from the plain and ordinary meaning of the claim terms.  Segan's proposed construction for "access" was so convoluted as to be practically unintelligible:

> **the target website uses the unique identifier on the user device to access the user's record at the service provider"** *means the target website communicates information associated with the user to the service provider so that subsequent activity (offering a new character enhancement) is consistent with information in the user's record and thus conducted in a way suited to that user's particular character icon (its present state and nature, history of previously enabled character enhancements, user preferences, and user profile).*

Dkt. No. 85-09 at 9.  The Court agreed: "the patent uses the word 'access' many, many, many times.  And I do not believe there is a single time in which the patent uses the word 'access' that would support the contorted construction that you have given it."  Stahnke Decl. Ex. 1 (Nov. 20, 2014 Hr'g Tr.) at 6:9–13; *see also id.* at 7:13–18 ("[T]his is just one of a gazillion examples through the patent where the patent uses the verb 'access' in a normal way, in the way we would normally understand the word 'access' to

13

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

mean, mainly to access something to -- as they put it, to gain entry to it, to obtain, to acquire[.]"), 9:8–15

("[T]hose are clear examples of use of the word 'access' in the normal way, quote, unquote. That is to

say to acquire, to gain entry to. And I believe that every time the word 'access' is used, it is used in that

way and not in the way that you propose."). Segan's claim construction position was objectively

baseless, and thus warrants sanctions under Fed. R. Civ. P. 11(b)(2). *See Antonious*, 275 F.3d at 1072–

73; *iLOR, LLC*, 631 F.3d at 1378; *QPharma, Inc.*, 360 F.3d 1301.

The Court stated its preference for the plain and ordinary meaning of "access," *e.g.*, to "obtain,"

which Segan's counsel conceded Segan could not establish infringement under. Stahnke Decl. Ex. 1 at

22:23–23:1, 33:24–34:1, 66:22–24 ("That's how I view 'obtain.'. . . It's an active going in, taking it and

pulling it out. . . . [T]hat's a very strong concept of access. And that's not what the target website

does."). Nevertheless, consistent with the unreasonable manner in which Segan has litigated this case,

Segan adopted the Court's construction and pressed on, using the very construction under which it had

already conceded there was no infringement.[10] This runs afoul of Rule 11. *See Truesdell v. S. Cal.*

*Permanente Med. Group*, 209 F.R.D. 169, 177 (C.D. Cal. 2002) (awarding Rule 11 sanctions "solely on

the basis of Plaintiff's counsel's persistent prosecution of claims without any reasonable basis in the law .

. . [where] Defendant's counsel gave Plaintiff's counsel at least three opportunities to withdraw these

claims, and on each occasion cited to relevant authority demonstrating the speciousness of the

Complaint"); *ChemFree Corp. v. J. Walter, Inc.*, No. 1:04-CV-3711-JTC, 2008 WL 3884365, at *8 (N.D.

Ga. 2008) (in patent case, awarding Rule 11 sanctions "[i]n light of Defendants' persistent defense of

[inequitable conduct] claims despite clear evidence that the claims were frivolous"); *Battles v. City of Ft.*

*Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997) (noting that Rule 11 "allows sanctions when an attorney

continues 'insisting upon a position after it is no longer tenable'"); *Coburn Optical Indus., Inc. v. Cilco,*

*Inc.*, 610 F. Supp. 656, 660 (D.C.N.C. 1985) ("To persist in claims or defenses beyond a point where

they can no longer be considered well grounded violates Rule 11.").

---

[10] In order to make this change to its "access" construction, Segan had to alter its position on "target website" to a construction as equally convoluted as its "access" construction. The issues with Segan's "target website" construction are fully briefed in Zynga's motion for summary judgment (Dkt. No. 142). It is not necessary to repeat those arguments here, however, because Facebook never accesses Zynga's user record under any reasonable construction of the term, as Segan has already conceded twice.

14

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Likewise, Segan has premised its suit on a baseless reading of the limitation "without requiring

2    user interaction with the service provider," which Segan says "means without the user having to take an

3    action to leave the target website and visit a service provider site to take some action at that site."  Dkt.

4    No. 85-09 at 8; Dkt. No. 108-1 at A-14.  But there is nothing in the patent (or anywhere else) that

5    supports Segan's construction that the term excludes the direct communications that indisputably occur

6    between the user and Zynga's servers.  First, the patent itself repeatedly uses the term "service provider"

7    in a manner that includes its servers, and uses the term "service provider website" when intending to

8    refer to an actual website.  Second, Segan's construction would interpret "service provider" in two

9    different ways in the same clause of the asserted claim, in violation of established Federal Circuit

10   precedent.  *See, e.g., Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir.

11   1998); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998).

12   Segan's counsel's failure to comply with its Rule 11 obligations has resulted in substantial harm

13   to Zynga.  In addition to conducting business under the pall of litigation for three and a half years, Zynga

14   has expended substantial financial and personnel resources defending against Segan's frivolous claims.

15   The Court has already expressed its views on the weaknesses of Segan's infringement case, and indicated

16   that it intends to compensate Zynga for the harm that has been done—but Segan has pressed on.  The

17   specter of attorneys' fees has done nothing to dissuade them.

18

19

20   The only way to compensate Zynga for these harms, and deter similar conduct in

21   the future, is to sanction Segan's counsel.

22   **IV.   CONCLUSION**

23   For the foregoing reasons, Zynga requests the Court dismiss the current suit with prejudice; order

24   Segan's counsel to pay Zynga's attorneys' fees and costs incurred to date, in an amount to be determined

25   through further briefing; and order any additional sanctions the Court determines to be just and proper.

26

27

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Dated:  April 21, 2015                            DURIE TANGRI LLP

2                                            By:  _____/s/ Sonali D. Maitra_____

3                                                          SONALI D. MAITRA

4                                            Attorneys for Defendant
                                             ZYNGA INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT ZYNGA INC.'S NOTICE OF MOTION AND MOTION FOR SANCTIONS
CASE NO. 3:14-CV-01315-VC