UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEGAN LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ZYNGA INC,<br><br>　　　　　Defendant. | Case No. 14-cv-01315-VC<br><br>**ORDER GRANTING MOTION FOR ATTORNEYS' FEES; GRANTING IN PART MOTION FOR SANCTIONS** |

　　　　In the 1990's, Segan invented a system for people to browse the Internet. Today, Zynga makes video games that people can play while on Facebook. People don't browse the Internet while playing Zynga games on Facebook. But Segan sued Zynga for patent infringement. Segan lost at summary judgment, because no reasonable juror could conclude that Zynga's games infringe Segan's patent. Now there are two questions. First, is this an "exceptional case" within the meaning of 35 U.S.C. § 285, such that Segan should pay Zynga for its attorneys' fees? The answer to that question is yes, and Segan is ordered to pay Zynga $1,188,773.93 to cover its fees. Second, should the law firm of Blank Rome, which represented Segan in this case, be sanctioned under Rule 11 for filing and pursuing a frivolous lawsuit? The answer to that question is also yes.

**I.**

　　　　In the 1990's, Marc Segan came up with an idea for how people could surf the Internet, and how companies could draw Internet users to their websites. His idea was to allow Internet users to obtain an "icon" (say, an animated image of a cowboy or a baseball player) and entice the users to travel to designated websites with their icons. So for example, a person with a cowboy icon might visit a designated website because the site offers "enhancements" to cowboy icons (such as cowboy boots, or hats, or spurs). The person might click a button on the website, or correctly

answer a trivia question posed on the website, and his cowboy icon receives an enhancement as a reward (for example, a cowboy hat appears on the animated cowboy's head). And hopefully while the person is visiting the site with his cowboy icon, he might buy an actual product – perhaps real cowboy boots, or perhaps a bottle of Cowboy™ Bourbon – to make the whole endeavor worthwhile for the participating website.

In December 2000, Segan and his co-inventor, Gene Lewin, filed a patent application for this invention. Six years later, the Patent and Trademark Office issued them U.S. Patent No. 7,054,928. The patent is titled, "system for viewing content over a network and method therefor." The first paragraph of the background section states that the invention "generally relates to techniques for exploring web sites over a global computer network (e.g., the Internet)." '928 Patent, 1:17-19. "More particularly," the paragraph continues, "the present invention pertains to a system for employing an agent, character symbol, representation or icon for exploring web sites and for directing or providing users of the system with incentive to access certain sites." *Id.*, 1:19-23.

A more detailed explanation of the invention is given at columns 3 and 4 of the patent's specification:

> To become an authorized user of the inventive system, registration with a system provider will be required. This is accomplished by a user accessing a system provider web site whereupon the user will be given the option of providing specific demographic data as well as preference and interest data, e.g., hobbies, interests, etc. The user will also be assigned or provided an opportunity to select a character icon for use with the system. Of course, certain character icons may suggest particular traits or demographic information of the selecting user, in which case specification of user preferences may not be required at all. . .
>
> In the preferred embodiment, target sites desirous of providing enhancement content for character icons in an effort to lure users to the target sites will also be required to register with the service provider, such as by paying a fee, etc. The service provider will then provide the target sites with the necessary coding to offer enhancement content that is compatible with the character icons. The service provider may then notify user subscribers of the web site addresses for the target subscribers such that the user subscribers can use the target addresses to locate and acquire available enhancements.

*Id.*, 3:32-42, 3:64-4:7.

Segan accused Zynga of infringing Claim 1 of the patent,[1] which claims the following system:

> a user device having a processor and comprising:
>
> a browser program capable of being run on said processor for viewing website pages;
>
> a graphical user interface (GUI) application capable of being run on said processor, containing a proprietary communication protocol and providing a GUI for depicting a character icon; and
>
> a unique identifier for identifying the user of the user device;
>
> a service provider for maintaining a user record corresponding to said user, for communication with said GUI application by means of said proprietary communication protocol, for authorizing the GUI application to depict the character icon, and for providing one or more previously enabled character enhancements for the user's character icon depicted in the authorized GUI application, wherein said user record comprises identification of the user's character icon, predetermined user preferences, and the one or more previously enabled character enhancements; and
>
> a target website for offering a new character enhancement for the user's character icon, wherein the new character enhancement is capable of being enabled in the user's record at the service provider without requiring user interaction with the service provider, and wherein the character enhancements are obtained per predefined authorization rules from the service provider and/or the target website in addition to the predetermined user preferences; and
>
> wherein, when the user visits the target website using the browser program, the target website uses the unique identifier on the user device to access the user's record at the service provider without requiring user interaction with the service provider, whereby any character enhancement offered to the user is appropriate for the user's character icon.

'928 Patent, 18:50-19:18.

The specification gives context to this claim language by identifying the three "objects" of the invention: (1) "to provide an entertaining system and method of using the Internet to locate and acquire user enhancements or upgrades to a character symbol or icon as well as special offers or coupons incidental to the character icon, for use by the system user"; (2) "to provide for a novel advertising technique to attract Internet users to advertiser web sites by offering desired user

---

[1] Segan initially asserted other claims as well, but had dropped them by the time of claim construction and summary judgment.

incentives such as enhancements or upgrades to a character icon"; and (3) "to provide a novel educational, guiding and training system and method wherein character enhancements will be accessible upon navigating the Internet and locating information and/or correctly answering queries." *Id.*, 2:1-15.

In other words, Segan invented a system whereby a person who might for some reason be interested in using a character icon to browse the Internet is incented to visit particular "target websites" from which the icon could receive "enhancements" from those websites.

## II.

Zynga was founded in 2007. It is not in the business of finding ways for people to explore the Internet. It is a social video game company. Zynga's first game was "Zynga Poker," which people could play on an application on Facebook. Zynga Poker simulated a casino environment, allowing people on Facebook to enter the casino and play poker at virtual tables, including with their Facebook friends. Although Zynga Poker was launched on Facebook, now people can play it on other platforms, including on Zynga's own website.

One of Zynga's most popular and successful games is FarmVille, which was launched on Facebook in 2009, and which is now available on other platforms. Like the poker game, FarmVille is a social network game. People play by tending to and managing an imaginary farm that they see on the screen. For example, they plow land, grow crops, build barns, and raise livestock. They can purchase "Farm Coins" with real money, or they can earn Farm Coins through game play. And they can use the Farm Coins to make purchases within the game to build up their farms. Players interact with other farmers who are their "neighbors," selling and buying livestock or trees or bushels, or just helping each other out with their farms. The player begins by choosing an avatar, i.e., an animated figure of his farmer. And the farmer is customizable. For example, the player might be able to obtain a red shirt for his farmer on the video game. The player does not browse the Internet with his farmer; he just plays FarmVille with his farmer.

## III.

Segan sued Zynga for patent infringement, contending that FarmVille and numerous other Zynga games, when played on Facebook, infringe the '928 patent and its "unique system and

method" for Internet browsing. 2:19-24. Segan lost the case. The Court granted summary judgment for Zynga, concluding no reasonable juror could find infringement because, as a matter of law, at least two claim limitations (and likely more) were not met.

The primary question now is whether Segan's infringement suit was so unreasonable that it is an "exceptional case" within the meaning of 35 U.S.C. § 285, which would qualify Zynga for an award of attorneys' fees. "An exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) *or* the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ----, 134 S.Ct. 1749, 1756 (2014) (emphasis added). This case is indeed exceptional, and Segan is indeed required to pay Zynga's fees, because the lawsuit was objectively baseless from the start. It is obvious that Claim 1 in the '928 patent describes an invention very different from the one Zynga practices in games like FarmVille. This is perhaps best illustrated by a claim construction position relating to the word "access" that Segan took throughout most of the litigation.

Among other things, Claim 1 of the '928 patent identifies a "service provider" from which the user obtains the character icon and which stores the user's information, and a "target website" that people visit to get enhancements for their characters. Claim 1 states that the target website uses a "unique identifier" on the user's device to "access" the user's record "at" the service provider, "whereby any new character enhancement offered to the user is appropriate for the user's character icon." In other words, with the invention described in the '928 patent, when someone is browsing the Internet with his cowboy icon and goes to a target website, that website accesses the user's record from the service provider so that the target website knows to offer the cowboy a pair of boots (rather than, say, a baseball glove). So for there even to be a chance of infringement, Facebook (the target web site) would need to access from Zynga (the service provider) the user record of the person playing FarmVille, so that Facebook could offer an enhancement for that person's FarmVille icon. But that doesn't happen, because that's not the way the Zynga-Facebook system works. That is so for a variety of reasons, but one of the most obvious is that Facebook does not "access" or "obtain" any user records for FarmVille players from Zynga.

To try to avoid this glaring problem, Segan proposed that when Claim 1 says that the target website *accesses* the user record *at* the service provider, what the claim really means is that the target website *sends* user information *to* the service provider. Specifically, Segan proposed that the phrase "target website uses the unique identifier on the user device to access the user's record at the service provider" should be construed as follows: "the target website communicates information associated with the user to the service provider so that subsequent activity (offering a new character enhancement) is consistent with information in the user's record and thus conducted in a way suited to that user's particular character icon . . . ."

This was one of the main pillars on which Segan's infringement suit rested – the assertion that when Facebook "communicates information . . . to the service provider," Facebook is somehow "accessing" user records from Zynga. Segan proposed this construction even though every time the verb "access" or "accessing" appears in the patent (and it appears many times), it is used in the ordinary way (i.e., "to obtain" or "gain entry to"). Segan might as well have argued that the sky is the ground. Even in the world of patent law, where lawyers and experts often take great liberties with words, this proposed construction of "access" stands out as exceptional. It is more lacking in merit than the patent plaintiff's proposed construction of the word "automatic" in *Lugus IP, LLC v. Volvo Car Corp.*, 2015 WL 1399175 (D.N.J. Mar. 26, 2015), which resulted in an award of attorneys' fees based on the objective baselessness of the infringement claim alone, without even considering the plaintiff's litigation conduct. *Id.* at *6. It is more unreasonable than the plaintiff's proposed construction in *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1365 (Fed. Cir. 2012). And it is far more egregious than post-*Octane Fitness* cases in which courts have denied motions for attorneys' fees. *See, e.g.*, *EON Corp. IP Holdings LLC v. Cisco Sys. Inc.*, 2014 WL 3726170 (N.D. Cal. Sept. 2, 2014); *Site Update Solutions, LLC v. Accor North America, Inc.*, 2015 WL 581175 (N.D. Cal. Feb. 11, 2015); *Unwired Planet v. Apple*, No: 13-cv-4134-VC, Dkt. 468 (N.D. Cal. Aug. 28, 2015).

In October 2014, before final claim construction charts were due under the local patent rules, Zynga filed a motion to levy a bond against Segan, to protect Zynga's right to recover attorneys' fees should the case eventually be deemed exceptional under 35 U.S.C. § 285. In its

opposition to that motion, Segan doubled down on its position that to "access" means to "send." Segan insisted that Facebook "accesses" user records because "Zynga's own engineer, Kyle Saugier, confirmed that *Facebook provides to Zynga* a unique user identifier that results in that specific user's record being accessed and engaged-at the point where the user left off-in the game." Opp. at 4 (Dkt. No. 88) (emphasis added). This argument – that "access" means "provides" – didn't go very well for Segan at the hearing on the bond motion. So in its final claim construction chart, Segan dropped its proposed construction of "access" and agreed that the verb "access" means "obtain."

But then, to get around the fact that Facebook does not actually access a user's record from Zynga (at least when "access" is used in any remotely understandable fashion), Segan came up with a different way of tackling the same problem: it proposed, for the first time, to construe the word "website" (of "target website") as "a set of related web pages, each page identified by a URL and including its underlying code and all content presented by a browser when a user visits that page." In other words, Segan's new infringement theory was that when a user plays FarmVille while on Facebook, the FarmVille game becomes part of the "target website," and therefore when Zynga is sending code and content to the user of the FarmVille game, the "target website" is actually "accessing" the code and content (even though Facebook never gets it). As the discussion in Section I illustrates, that's not what the '928 patent meant when it used the phrase "target website." But even aside from that, as the Court explained in its claim construction and summary judgment order, at least two other claim limitations were obviously not met as a matter of law. To summarize the key points from the Court's claim construction order and order granting summary judgment for Zynga:

- Claim 1 of the '928 patent describes the invention as allowing the user's character to be enhanced "without requiring user interaction with the service provider . . . ." '928 Patent, 19:15-16. But when someone plays FarmVille while on Facebook and seeks an enhancement for his farmer (say, by getting the farmer a red shirt), it is undisputed that the user "interacts" with Zynga. He sends a request directly to Zynga, and Zynga responds to the request by providing the enhancement, without Facebook being

involved in the transaction. To try to get around this obvious problem, Segan proposed that "without requiring user interaction with the service provider" should mean "without the user having to take an action to leave the target website and visit a service provider to take some action at that site." But there was no support for such a narrow construction of "interacting" with the service provider; therefore, the Court construed "interaction" in its plain and ordinary way, as some action or engagement between two or more entities, which is precisely what happens between Zynga and a user playing a Zynga game on Facebook. Therefore, in the accused system, the user does interact with the service provider, and thus there is no infringement.

- Claim 1 identifies as one element of the system "a target website for *offering* a new character enhancement for the user's character icon." But Facebook does not offer the farmer anything. To try to deal with that problem, Segan proposed that a "target website for offering a new character enhancement" should mean "a target website making a character enhancement known and available to a user." But making something "known and available" is not what "offering" means, nor did the patent ever use the word "offering" in that way. Nor, in any event, does Facebook even make character enhancements "known and available" to people playing the FarmVille game. Zynga, through the FarmVille game itself, makes the enhancements "known and available" to the user.

Overall, it was obvious that the '928 patent's system for browsing the Internet with character icons and getting enhancements from various websites did not cover the act of playing games like FarmVille while on Facebook. From the beginning of the case, Segan's claim construction positions and infringement theory were so unreasonable as to make this case "exceptional" within the meaning of section 285, even without reference to Segan's litigation conduct.[2]

---

[2] However, it is worth noting that Segan's litigation conduct would further support an award of attorneys' fees under section 285. Indeed, the Blank Rome attorney who appeared at the hearing on the motion for attorneys' fees admitted he "cringed" at some of the conduct of his colleagues. *See* Order Denying Motion to Compel, Dkt. 135 (Judge Spero denying Segan's motion to compel,

8

In light of the foregoing, the motion for attorneys' fees is granted. And the requested fee amount of $1,188,773.93 is reasonable. Indeed, it is on the low side for a case like this, particularly considering the high quality of the representation Zynga received. Segan argues that Zynga has not adequately justified its fee request, but given the length of the litigation and the difficulty Segan put Zynga through, the requested amount falls so squarely within the range of reasonableness that the Supplemental Declaration of Sarah Stahnke describing these fees is more than sufficient.

## IV.

Zynga also asks the Court to sanction Blank Rome, the law firm representing Segan, under Rule 11, and hold the firm responsible for Zynga's attorneys' fees for filing a frivolous complaint against Zynga. Sanctions are warranted if (1) "the complaint is legally or factually baseless from an objective perspective," and (2) the attorneys failed to conduct "a reasonable and competent inquiry before signing and filing [the complaint]." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002). In the patent context, "a reasonable and competent inquiry" means, "at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300-1301 (Fed. Cir. 2004); *see also Antonious v. Spalding & Evenflo Co.*, 275 F.3d 1066, 1074 (Fed. Cir. 2002). Importantly, the attorney's pre-filing interpretation of the claims must be nonfrivolous. *Q-Pharma*, 360 F.3d at 1301.

Segan has waived the attorney work product privilege to allow the Court to conduct at least a partial assessment of the quality of Blank Rome's pre-filing investigation. Although much of the pre-filing work product that Segan submitted was heavily redacted, it appears Blank Rome at least engaged in the activities one would expect of a patent plaintiff's lawyers before filing suit. But to avoid sanctions, Segan's pre-filing interpretation of the claims must have been "reasonably

---

which it filed on Christmas Eve and in violation of numerous rules); Deposition of Jose Zagal, Segan expert, Dkt. 167-02 (Segan's attorney instructing its expert not to answer – time and time again – when Zynga's counsel asked the expert about the expert's factual investigation to support his expert testimony and about the assumptions he was adopting as part of his expert opinion).

supported by the intrinsic record." *Q-Pharma*, 360 F.3d at 1301. While "[r]easonable minds can differ as to claim construction positions, . . . there is a threshold below which a claim construction is 'so unreasonable that no reasonable litigant could believe it would succeed,' and thus warrants Rule 11 sanctions." *Raylon*, 700 F.3d at 1368 (quoting *iLor, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011)). For the reasons discussed in Section III, the claim construction position taken by the Blank Rome attorneys fell below that threshold. This was not a case in which attorneys investigated a potential claim on behalf of their client and concluded it had merit based on partial information, only later to learn that their information was wrong. For example, there is no indication the attorneys received bad information from their client. Nor is there an indication that the attorneys lacked notice about how the accused products worked. This case was objectively baseless from the start, and no amount of lawyer activity prior to filing suit could have changed that.

"When a court imposes sanctions, the type and amount of the sanctions remain largely within the discretion of the Court." *Paciulan v. George*, 38 F.Supp.2d 1128, 1144 (N.D. Cal. 1999) *aff'd* 229 F.3d 1226 (9th Cir. 2000). Zynga has requested an award of the full amount of its attorneys' fees. This is a close question. Holding Blank Rome jointly and severally liable for the fee award would arguably be appropriate given that the sanctionable conduct was the filing of a frivolous complaint, which resulted in Zynga having to defend itself throughout a lengthy lawsuit. *See* Fed. R. Civ. P. 11(c)(4) ("The sanction may include . . . an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."); *see also View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000) ("A patent suit can be an expensive proposition. Defending against baseless claims of infringement subjects the alleged infringer to undue costs – precisely the scenario Rule 11 contemplates."). But three factors in this case weigh against holding Blank Rome jointly and severally liable for the full amount of Zynga's attorneys' fees.

First, under Rule 11, a sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). The Court believes that a sanction of $100,000, coupled with the reprimand that a sanctions award represents,

is sufficient to deter Blank Rome from bringing frivolous patent infringement suits in the future. And the award (accompanied by this opinion) puts similarly-situated attorneys on notice of the possibility that they could be held jointly and severally liable under Rule 11 for an entire section 285 fee award if they file such an objectively baseless patent infringement suit in the future. Though a greater award could better ensure that Zynga is adequately reimbursed, "[t]he main objective of the Rule is not to reward parties who are victimized by litigation; it is to deter baseless filings and curb abuses." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 553 (1991).

Second, even though the Blank Rome attorneys devised and put forth objectively baseless claim construction and infringement positions, the record suggests they did not pursue the lawsuit in bad faith or with an improper purpose. For example, several of the pre-filing communications among Blank Rome attorneys are more suggestive of lawyers who come to believe in a ridiculous argument than they are of lawyers who are preparing to file a lawsuit in bad faith. The apparent absence of bad faith is a factor courts can and should consider when deciding how much to sanction attorneys. *See, e.g.*, *Cox v. Deal*, 2011 WL 3418397, at *5 (D.S.C. Aug. 3, 2011); *Brubaker v. City of Richmond*, 943 F.2d 1363, 1387 (4th Cir. 1991).

Finally, because patent law is fast evolving, particularly with respect to the types of cases that might subject patent lawyers and their clients to liability for the opposing side's attorneys' fees, equity counsels against the full sanctions award Zynga seeks. For example, Blank Rome brought this suit on Segan's behalf in July 2011, three years before the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ----, 134 S.Ct. 1749, 1756 (2014); *see also Raylon,* 700 F.3d (involving Rule 11 sanctions and decided in 2012). Of course, this doesn't change the fact that the lawsuit was just as baseless in 2011 as it is now, and that's why Zynga is entitled to a full fee award against Segan under section 285. But the landscape is changing, such that the attorneys had less notice in 2011 than they do today of their own potential liability.

Accordingly, the Court finds that a sanction holding Blank Rome jointly and severally liable, with Segan, for $100,000 worth of Zynga's section 285 fee award is equitable and

adequately serves the deterrent purpose of Rule 11.[3]

    **IT IS SO ORDERED.**

Dated: September 10, 2015

_____
VINCE CHHABRIA
United States District Judge

---

[3] Zynga also moves to hold Blank Rome jointly and severally liable under 28 U.S.C. § 1927, which is denied. "Establishing attorney misconduct under § 1927 implicates a higher level of culpability than Rule 11," *Raylon,* 700 F.3d at 1371 n.6 (Fed. Cir. 2012). In any event, even if the Court were to sanction Blank Rome under § 1927, it would not do so for any amount above the $100,000 sanction it has already imposed under Rule 11.